# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

DOMINION ASSETS LLC,

    Plaintiff,

v.

MASIMO CORPORATION, et al.,

    Defendants.

Case No. 14-cv-03002-BLF

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

[Re: ECF 73]

Plaintiff Dominion Assets LLC ("Dominion") brings this patent infringement action against Defendants Masimo Corporation ("Masimo") and Cercacor Laboratories, Inc. ("Cercacor Laboratories") (collectively, "Defendants"), alleging infringement of two patents concerning non-invasive detection of the concentration of analytes in blood: U.S. Patent Nos. 5,379,764 (the "'764 patent") and 5,460,177 (the "'177 patent"). Before the Court is Defendants' motion for summary judgment of non-infringement and invalidity. For the reasons discussed below, the Court GRANTS IN PART and DENIES IN PART Defendants' motion.

## I. BACKGROUND

Dominion is the current owner and assignee of the '764 and '177 patents. The '764 patent, titled "Non-Invasive Determination of Analyte Concentration in Body of Mammals," was issued on January 10, 1995 to named inventors Russell H. Barnes, Jimmie W. Brasch, Sr., David L. Purdy, and William D. Lougheed. The '177 patent, titled "Method for Non-Invasive Measurement of Concentration of Analytes in Blood Using Continuous Spectrum Radiation," was issued on October 24, 1995 to named inventors David L. Purdy, Perry Palumbo, and Mark DiFrancesco. Both patents are now expired.

The asserted patents improve upon known methods for non-invasively measuring the concentration of blood components using radiation (i.e., light). In broad terms, the generally known method takes advantage of interactions between light radiation and blood analytes. Light that enters the body is different from light that exits the body after interacting with components in the blood. That difference can be detected using spectroscopy and compared using mathematical techniques to arrive at the concentration of the analyte of interest. Early methods were imprecise at measuring blood analytes that exist only in relatively low concentrations (such as glucose), due to interference with readings caused by other components in the blood. *See* '764 patent, col. 2 ll. 11-47. The '764 patent recognizes this problem and overcomes it through the use of mathematical techniques of pretreatment and multivariate analysis to respectively "eliminate or minimize the effects of detector offset and optical scattering drift" and determine the concentration of glucose based upon its spectral properties. *Id.*, col. 2 l. 63-col. 3 l. 16.

The '177 patent similarly improves on a known method of non-invasive measurement, this time using infrared radiation across a continuous spectrum, in order to address deficiencies in the prior art when dealing with blood analytes in low concentrations. '177 patent, col. 1 l. 49-col. 2 l. 2. Low concentrations are associated with a general problem of low signal-to-noise ratio when using radiation in the near-infrared portion of the spectrum, as not only is the radiation absorbed by water in the body, but the analyte of interest also contributes little to the total signal intensity. *Id.* The '177 patent confronts this problem by describing a manner in which intensity-modulated radiation can be used so that the intensity of radiation used on the body can be increased (thereby amplifying the detected signal) without the undesirable consequences normally associated with excess radiation. *Id.*, col. 2 ll. 13-25.

Dominion currently asserts claim 1 of the '764 patent and claims 1-3 of the '177 patent. Claim 1 of the '764 patent recites:

> 1. A method of non-invasive determination of the concentration of at least one analyte in the blood of a mammal, comprising the steps of:
> (a) projecting near infrared radiation on a portion of the body of the mammal, said radiation including a plurality of wavelengths;
> (b) sensing the resulting radiation emitted from said portion of the body;
> (c) deriving from the sensed resulting radiation a first expression for

> the magnitude of said sensed radiation as a function of wavelength of the sensed radiation;
> (d) pretreating said first expression to minimize the influence of instrument offset and drift to obtain a second expression for the magnitude of said sensed radiation as a function of wavelength; and
> (e) performing multivariate analysis of said second expression to obtain a value for the concentration of said analyte.

'764 patent, col. 8 ll. 33-51. Claims 1-3 of the '177 patent recite:

> 1. A method for non-invasive detection of the concentration of a constituent of blood of a living animal, comprising the steps of:
> (a) irradiating a body part of the animal with intensity-modulated radiation over a continuous spectrum;
> (b) detecting the intensity of radiation emitted from the body part at a plurality of wavelength ranges within said continuous spectrum; and
> (c) using said detected intensity to calculate the concentration of the constituent.
>
> 2. The method of claim 1, wherein said step (c) comprises using lock-in modulation techniques synchronized with the modulation of said radiation simultaneously in said step (a) to filter out noise.
>
> 3. The method of claim 1, wherein said step (a) comprises repeatedly alternately irradiating and not irradiating the body part for a selected interval.

'177 patent, col. 5 ll. 25-42.

Masimo develops, manufactures, and markets non-invasive monitoring products, including ones that measure a variety of constituents in a patient's blood. Among the products accused are Masimo's Rainbow line of monitors, the Radical 7, Rad-57, Rad-87 and Pronto, which measure total hemoglobin, methemoglobin, and carboxyhemoglobin. Mot. 4-5, ECF 73; Ex. G to Mot. ¶ 9, ECF 74-7; Ex. H to Mot. ¶ 20, ECF 74-8. According to both parties' experts, each of the accused products include a Rainbow sensor, which uses 8 or 12 light emitting diodes (LEDs) that emit radiation at 8 or 12 discrete wavelengths on one side of a finger. Ex. G to Mot. ¶ 10, ECF 74-7; Ex. H to Mot. ¶¶ 26-28, ECF 74-8. A sensor measures the light that is emitted from the other side of the finger and outputs this information for processing. *Id.*

## II. LEGAL STANDARDS

### A. Summary Judgment

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Partial summary judgment that falls short of a final determination, even of a single claim, is authorized by Rule 56 in order to limit the issues to be tried." *State Farm Fire & Cas. Co. v. Geary*, 699 F. Supp. 756, 759 (N.D. Cal. 1987).

The moving party "bears the burden of showing there is no material factual dispute," *Hill v. R+L Carriers, Inc.*, 690 F. Supp. 2d 1001, 1004 (N.D. Cal. 2010), by "identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). In judging evidence at the summary judgment stage, "the Court does not make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the nonmoving party." *First Pac. Networks, Inc. v. Atl. Mut. Ins. Co.*, 891 F. Supp. 510, 513-14 (N.D. Cal. 1995). For a court to find that a genuine dispute of material fact exists, "there must be enough doubt for a reasonable trier of fact to find for the [non-moving party]." *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009).

### B. Indefiniteness

The Patent Act requires that a patent specification "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as the invention." 35 U.S.C. § 112, ¶ 2.[1] "A patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus v. Biosig Instruments*, 134 S. Ct. 2120, 2124 (2014). While the scope of the claims must be clear enough to "apprise the public of what is still open to them," *Markman v. Westview Instruments*, 517 U.S. 370, 373 (1996), "the definiteness requirement must take into account the inherent limitations of language. Some modicum of uncertainty . . . is the price of ensuring the appropriate incentives for innovation." *Nautilus*, 134 S. Ct. at 2128 (internal citations omitted). Thus, "the certainty which

---

[1] The America Invents Act (AIA), Pub. L. No. 112–29, effective September 16, 2012, newly designated § 112, ¶ 2 as § 112(b). Because the '764 and '177 patents were filed before the effective date of the AIA, the Court will refer to the pre-AIA version in this order.

4

the law requires in patents is not greater than is reasonable, having regard to their subject-matter." *Id*. at 2129 (quoting *Minerals Separation v. Hyde*, 242 U.S. 261, 270 (1916)).

Claims containing terms of degree are not inherently indefinite. *Sonix Tech. Co. v. Publications Int'l, Ltd.*, No. 2016-1449, 2017 WL 56321, at *5 (Fed. Cir. Jan. 5, 2017) (citing *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014)). "[A]bsolute or mathematical precision is not required." *Interval Licensing*, 766 F.3d at 1370. Nevertheless, it is not enough for there to be "some standard for measuring the scope of the phrase." *Id*. at 1370-71. Instead, "[t]he claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Id*. at 1371. "[W]ritten description is key to determining whether a term of degree is indefinite;" for example, disclosed "examples and procedures [may] provide[] guidance and points of comparison for skilled artisans." *Sonix Tech.*, 2017 WL 56321, at *6.

### C. Reduction to Practice

"In order to establish an actual reduction to practice, the inventor must prove that: (1) he constructed an embodiment or performed a process that met all the limitations of the interference [claim]; and (2) he determined that the invention would work for its intended purpose." *In re Garner*, 508 F.3d 1376, 1380 (Fed. Cir. 2007) (quoting *Taskett v. Dentlinger*, 344 F.3d 1337, 1340 (Fed. Cir. 2003)). With respect to the first prong, "the constructed embodiment or performed process [must] include the precise elements recited in the [claim]." *Eaton v. Evans*, 204 F.3d 1094, 1097 (Fed. Cir. 2000). However, it need not be made or sold commercially. *Taskett*, 334 F.3d at 1341. With respect to the second prong, "[d]epending on the character of the invention and the problem it solves, determining that the invention will work for its intended purpose may require testing." *Cooper v. Goldfarb*, 154 F.3d 1321, 1327 (Fed. Cir. 1998) (citing *Mahurkar v. C.R. Bard Inc.*, 79 F.3d 1572, 1578 (Fed. Cir. 1996)). In that case, the tested embodiment "must actually work for its intended purpose" and "the inventor must contemporaneously appreciate that the embodiment worked and that it met all the limitations of the [claim]." *Cooper*, 154 F.3d at 1327 (internal citations omitted).

In addition, "[i]n order to establish an actual reduction to practice, an inventor's testimony

must be corroborated by independent evidence." *Cooper*, 154 F.3d at 1330.  "Independent corroboration may consist of testimony of a witness, other than the inventor, to the actual reduction to practice or it may consist of evidence of surrounding facts and circumstances independent of information received from the inventor." *In re Garner*, 508 F.3d at 1380 (quoting *Reese v. Hurst*, 661 F.2d 1222, 1225 (CCPA 1981)).  The sufficiency of corroborating evidence is evaluated under a "rule of reason" standard, which "requires an evaluation of all pertinent evidence when determining the credibility of an inventor's testimony." *Cooper*, 154 F.3d at 1330.

### D. Infringement

The infringement analysis entails two separate steps: (1) interpreting the meaning and scope of patent claims through claim construction; and (2) determining whether the claims, as construed, read on the accused product. *Markman v. Westview, Instruments Inc.*, 52 F.3d 967, 976, 979 (Fed. Cir. 1995) (en banc); *Southwall Techs.*, 54 F.3d at 1575.  This Court issued its claim construction ruling on April 28, 2015, and the parties have incorporated those constructions into their summary judgment arguments.

To establish infringement, a patentee must show that the defendant's accused product "meets each claim limitation either literally or under the doctrine of equivalents." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1377 (Fed. Cir. 2005).  Literal infringement requires a showing that each claim element is present, exactly. *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 796 (Fed. Cir. 1990).

## III. DISCUSSION

### A. The '177 Patent

#### i. Invalidity

Defendants seek summary judgment that the asserted claims of the '177 patent are invalid because they are (1) indefinite and (2) anticipated by U.S. Patent No. 5,348,003 to Caro ("Caro"). The Court addresses each in turn.

##### a. Indefiniteness

Defendants argue the asserted claims of the '177 patent are indefinite under 35 U.S.C. § 112, ¶ 2 because, under the Court's construction, "continuous spectrum" means "every wavelength

6

1  within a range, or a large number of closely-spaced discrete wavelengths within the range," and
2  the words "large" and "closely-spaced" do not, pursuant to *Nautilus*, 134 S. Ct. at 2129, allow a
3  person of ordinary skill in the art to determine the scope of the claims with reasonable certainty.
4  Mot. 12-14, ECF 73.  Defendants point out that the specification only provides one example of
5  discrete wavelengths that comprise a "continuous spectrum," '177 patent, col. 3 ll. 15-18, and
6  argue that this is not enough to permit a person of ordinary skill in the art to determine the
7  objective boundaries of the claims.  Mot. 13-14, ECF 73.

8        Dominion responds that "large" and "closely-spaced" are not sources of indefiniteness
9  because a skilled artisan would know, based on basic sampling concepts that are well understood
10 in the art, that they simply require that there be a sufficient number of wavelengths to provide a
11 mathematically complete description of the underlying signal (i.e., to accurately capture how the
12 intensity of the light passing through a body part changes as a function of wavelength).  Opp. 8-
13 10, ECF 83.  Accordingly to Dominion, this is a sufficiently objective standard to save the claims
14 from indefiniteness.  *Id.* at 8-11.

15       The Court agrees with Defendants that the asserted claims are indefinite.  The words
16 "large" and "closely-spaced" are terms of degree.  Although claims containing "terms of degree
17 are [not] inherently indefinite," they must still be such that "[t]he claims, when read in light of the
18 specification and the prosecution history, . . . provide objective boundaries for those of skill in the
19 art."  *Interval Licensing*, 766 F.3d at 1370.  For example, in *Sonix Tech.*, 2017 WL 56321, at *6,
20 the Federal Circuit recently found that "visually negligible" did not render claims indefinite
21 because it involved "what can be seen by the normal human eye," which "provides an objective
22 baseline through which to interpret the claims."  By contrast, in *Interval Licensing*, 766 F.3d at
23 1374, the Federal Circuit found that a claim involving the display of content "in an unobtrusive
24 manner that does not distract a user" was indefinite because the claims provided "no objective
25 indication of the manner in which content images are to be displayed to the user," and the written
26 description—which only contained a single example—"left [a skilled artisan] to wonder what
27 other forms of display are unobtrusive and non-distracting."

28       Here, "large" and "closely-spaced" do not have sufficient objective boundaries to save the

claims from indefiniteness. The specification contains a single example of what would constitute a "large" and "closely-spaced" number of discrete wavelengths in a range:

> A source that provides radiation over a continuous spectrum provides radiation at every wavelength within a range, or at a large number of closely-spaced discrete wavelengths within a range. For example, to provide radiation over a continuous spectrum, at every wavelength within the range from 1100 to 2500 nanometers, a tungsten filament bulb may be used. Alternatively, there could be provided a large number of discrete wavelength radiation sources emitting simultaneously and separated in wavelength, preferably equally, across the spectrum. *For example, there could be provided discrete wavelength radiation sources at intervals of about 10-15 nm, to provide radiation over a continuous spectrum.*

'177 patent, col. 3 ll. 15-28 (emphasis added). From this disclosure, a skilled artisan would know that 93-140 wavelengths is a "large" number, and an interval within 10-15 nm is "closely-spaced." However, this gives no indication of what point a set of discrete wavelengths stops being "large" or "closely-spaced." Is it 92 wavelengths? 9 wavelengths? The claims, written description, and prosecution history provide no indication. There is no disclosure of acceptable ranges, requirements that the set of wavelengths must meet, or any other guidance beyond the passing mention of a single exemplary embodiment. As such, the skilled artisan is left to "consult the 'unpredictable vagaries of any one person's opinion.'" *Interval*, 766 F.3d 1374 (quoting *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005)). This precludes determining the scope of the claims with reasonable certainty. *Nautilus*, 134 S. Ct. at 2129.

It no answer that, as Dominion contends, "large" and "closely-spaced" could allegedly be interpreted as a sufficient amount to provide a "mathematically complete description" under sampling theory. As an initial matter, this is not the Court's claim construction. Dominion cannot inject new or different requirements into claim terms—effectively a second-chance claim construction—to save its claims from indefiniteness. Moreover, this interpretation is not supported by the '177 patent itself. The written description says nothing about a mathematically complete description, or gives any indication that its reference to "a large number of closely-spaced discrete wavelengths within a range," '177 patent, col. 3 ll. 17-18, is tied to this concept. As such, "large" and "closely-spaced" do not require this gloss. Finally, even if the Court were to consider interpreting these words as "sufficient to provide a mathematically complete description,"

8

it would not make the claims definite. "Sufficient" is not the same as "large," and the Court's construction requires the latter. For example, a certain number of data points could be sufficient to provide a "mathematically complete description" without being "large." Even a mere two points describe a line. As such, Dominion's proposed interpretation does not help define objective boundaries for "large." Accordingly, even the "mathematically complete description" standard advanced by Dominion does not pass muster under *Nautilus*.

In sum, the asserted claims fail to "provide objective boundaries for those of skill in the art," *Interval Licensing*, 766 F.3d at 1370, which renders a skilled artisan unable to determine the scope of the claims with reasonable certainty, *Nautilus*, 134 S. Ct. at 2129. Because of this, they are indefinite under § 112, ¶ 2.

### b. Anticipation

Defendants argue in addition that the asserted claims of the '177 patent are invalid because they are anticipated by Caro. In their briefing, the parties agree that Caro discloses all of the limitations of the asserted claims except for "intensity-modulated radiation." *Compare* Mot. 14-16, ECF 73, *with* Opp. 12-13, ECF 83. The Court construed this term to mean "radiation the intensity of which can be adjusted (increased or decreased in level)," which was a proposal by Dominion that Defendants agreed to adopt at the Markman hearing. Order Construing Claims 5 n.2, ECF 55.

In their motion, Defendants argue that Caro discloses "intensity-modulated radiation"—and thus, anticipates the asserted claims of the '177 patent—because it discloses turning a light source on and off. Mot. 14-16, ECF 73. Defendants maintain that this falls within the Court's construction of "intensity-modulated radiation" and that Dominion's submissions admit as much, as its infringement contentions, expert report, and expert deposition testimony identify this same behavior in the accused products (i.e., switching the LEDs on and off) as "intensity-modulated radiation," *id*. at 14 (citing Ex. H to Mot. at ¶¶ 39, 41, ECF 74-8). Defendants also point out that Dominion's claim construction briefing states that "pulsing" a light source by turning it on and off is one of the disclosed embodiments of "intensity-modulated radiation" in the '177 patent, *id*. at 15 (citing Dominion Br. 15, ECF 37, which cites '177 patent, col. 5 ll. 9-10).

Dominion, in response, admits that Caro teaches "radiation formed in a temporal modulation pattern," but argues that this is not "intensity-modulated radiation" because it neither includes the ability to adjust this pattern during operation nor an ability to change the intensity of the light source during operation. Opp. 12-13, ECF 83. This, according to Dominion, prevents it from impacting the temperature of the body part or adjusting the signal-noise ratio, which were the two advantages of modulation that the '177 patent identified. *Id*. at 12. Because of this, Dominion asserts, Caro does not disclose this limitation. *Id*. at 12-13.

Dominion reads too much into the Court's construction. This language—which Dominion itself proposed—simply requires that the "intensity" is "adjusted" in the form of getting "increased or decreased in level." It says nothing about changing modulation patterns or adjusting intensity during operation, and accordingly requires neither. This interpretation is consistent with the claims and specification, neither of which suggest that an ability to adjust mid-operation is required. *See* '177 patent, col. 3 ll. 5-15, col. 5 ll. 7-13, 25-42.

Given this, simply turning a light source on and off, as in flashing or pulsing, falls within the Court's construction. This is because turning the light source on "increase[s] [intensity] in level," and turning the light source off "decrease[s] [intensity] in level." The specification confirms this, as flashing a light source is one of its two disclosed embodiments:

> It will be understood that other techniques may be employed to obtain intensity-modulated incident radiation. For example, a radiation source 15 may be provided which can be continuously flashed to obtain a pulsed signal.

'177 patent, col. 5 ll. 7-11. Dominion itself even acknowledged this embodiment at claim construction. Dominion Br. 15, ECF 37 ("[T]he specification identifies pulsing the light source on and off as a means to generate intensity-modulated radiation.").

The parties do not seriously dispute that Caro discloses turning a light source on and off. Dominion's expert, Dr. Webster, agreed that "the Caro light source turns on and off" during deposition. Ex. F to Mot. at 189:6-10, ECF 74-5. Nor could Dominion take a contrary position, as Caro states:

> Other modulation patterns could consist of a train of pulses of short duration with essentially zero light transmitted through the modulator

10

1 between pulses, or of a repetitively modulated signal of a non-sinusoidal nature.

2 Caro, col. 9 ll. 27-30. Accordingly, Caro discloses turning a light source on and off, and thus

3 "intensity-modulated radiation" within the Court's construction.

4 Dominion's position is also belied by its own submissions. In its infringement contentions,

5 expert report, and expert's deposition testimony, Dominion consistently identified flashing the

6 LEDs in the accused products (repeatedly turning them on and off) as "intensity-modulated

7 radiation." Ex. M to Mot. at 38, ECF 74-13; Ex. H to Mot. ¶¶ 39, 41, ECF 74-8; Ex. I to Mot. at

8 64:1-65:13, ECF 74-9. Dominion cannot change the view of "intensity-modulated radiation" it

9 has taken on infringement to make its validity case more favorable. This further counsels against

10 adopting its view.

11 Accordingly, the Court agrees with Defendants that, in addition to being invalid as

12 indefinite, the asserted claims of the '177 patent are anticipated by Caro. For both of these

13 reasons, Defendants' motion for summary judgement of invalidity of the asserted claims of the

14 '177 patent is GRANTED.

### ii. Non-Infringement

Since the '177 patent is invalid, Defendants' motion for summary judgment of non-infringement of the asserted claims of the '177 patent is DENIED AS MOOT.

## B. The '764 Patent

### i. Invalidity

Turning to the '764 patent, Defendants argue that claim 1 is invalid because it is anticipated by U.S. Patent No. 5,355,880 to Thomas ("Thomas"). Dominion does not dispute that Thomas discloses every limitation of claim 1, but takes the position that, because the '764 patent was reduced to practice before the filing date of Thomas (July 6, 1992), Thomas is not prior art. Ex. F to Mot. at 167:11-14, ECF 74-6; Ex. L to Mot. ¶ 69, ECF 74-12. In their motion, Defendants argue that Dominion's position fails because "no witness, fact or expert, has testified that any such actual reduction to practice took place." Mot. 17, ECF 73. Instead, Defendants maintain, Dominion can only allege reduction to practice based on weak excerpts from inventor William Brasch's lab notebooks and vague testimony from other inventors (William Lougheed

1   and Russell Barnes) who did not author these notebooks, the sum of which is insufficient to show
2   reduction to practice. Mot. 17-21, ECF 73.
3         Dominion disagrees, asserting that there is enough evidence to at least raise questions of
4   material fact that the '764 patent was reduced to practice through a rabbit study, which was
5   performed in October and December 1990, with data analysis complete by February 1991, by Drs.
6   Brasch, Barnes, and Lougheed in Dr. Brasch's laboratory in Columbus, Ohio. Opp. 15-17, ECF
7   83. As supporting evidence, Dominion identifies:

- The specification of the '764 patent, which describes an instance where its disclosed "technique was employed in developing a [sic] multivariate statistical model using data on glucose concentrations in the blood of rabbits." '764 patent, col. 7 ll. 26-28; *see generally id.*, col. 7 l. 26-col. 8 l. 26.
- Testimony of co-inventor Dr. Russell Barnes that he "was present for the rabbit tests that were made." Ex. EE to Opp. at 173:14-15, ECF 83-6. Barnes also testified that the participants "actually did" determine the value of glucose, Ex. E to Mot. at 37:21-38:13, ECF 74-5, and gave some indications about how they analyzed the data and verified results, *see, e.g.*, Ex. EE to Opp. at 98:2-101:1, 192:10-193:22, 214:6-217:22, ECF 83-6.
- Testimony of co-inventor Dr. William Lougheed that he personally participated in the rabbit studies. Ex. FF to Opp. at 46:15-17, ECF 83-7. Dr. Lougheed also testified that he recalled Drs. Brasch and Barnes performing multivariate analysis and that they determined the actual concentration of glucose. *Id.* at 53:19-55:19, 71:17-72:9. He also stated that the rabbit study data collected in October/November 1990 is what appears in the '764 patent. *Id.* at 52:21-53:2.
- Excerpts from the lab notebook of co-inventor Dr. Jimmie Brasch, which include entries from October and December 1990 containing data collected from a rabbit study, *see, e.g.*, Ex. S to Mot. at DOM003363-80, ECF 74-19, notes about "work[ing] with Rabbit data" and doing "PLS," *id.* at DOM003380-81, and notes that he observed "results too good to believe," results that "line up good, but all but

one are outliers" and results that "line up same or better, no outliers," *id.* at DOM003380.

- Excerpts from the lab notebook of non-inventor Dr. Mark DiFrancesco containing his personal notes from a June 2, 1992 presentation where Drs. Brasch and Barnes discussed the results of the rabbit study, along with supporting testimony. *See* Ex. DD to Opp., ECF 83-5.
- Testimony from Dominion's expert, Dr. Webster, opining that the rabbit study confirmed that the invention worked for its intended purpose. Ex. CC to Opp. ¶¶ 30-32, ECF 83-4.

As an initial matter, Dr. Webster's expert testimony appears to be based on a review of "evidence provided by Dr. Barnes during his deposition" and "evidence that Dr. Barnes provided a review of a rabbit study in June of 1992, as represented in the notebook of Dr. Mark DiFrancesco." Ex. CC to Opp. ¶¶ 31, 32, ECF 83-4. As such, Dr. Webster's opinion adds nothing beyond the testimony and documents of these witnesses, and does not constitute additional evidence of reduction to practice. In addition, the lab notebook excerpt from Dr. DiFrancesco, Ex. DD to Opp. at DOM001065, ECF 83-5, cannot be offered for the truth of whether the rabbit study was actually performed and whether it was successful. Dr. DiFrancesco has no personal knowledge of the rabbit study, so his notes about its substance are hearsay. As such, its relevance to reduction of practice is limited at best.

What primarily remains, then, is the testimony of Drs. Barnes and Lougheed, the lab notebook of Dr. Brasch, and the '764 patent itself. Although this evidence seems weak, the Court agrees with Dominion that, construing it in the light most favorable to Dominion, there are at least questions of material fact as to whether the rabbit study was a reduction to practice. To prove reduction to practice at trial, Dominion will bear the burden of showing that (1) the rabbit study met all of the limitations of claim 1; and that (2) the inventors determined that it worked for its intended purpose—non-invasively determining the concentration of a blood analyte (e.g., glucose). *See In re Garner*, 508 F.3d at 1380. Defendants focus their attack on this first prong, arguing that there is no disputed issue of material fact that the rabbit study did not include steps

13

1  "(d) pretreating . . ." and "(e) performing multivariate analysis of said second expression to obtain
2  a value for the concentration of said analyte." Mot. 18, ECF 73. The Court disagrees. With
3  respect to step (d), Dr. Brasch's notebook reports performing "normaliz[ation]," "correction,"
4  "segregat[ion]" and "averag[ing]" of spectra, *see, e.g.*, Ex. S to Mot. at DOM003380, ECF 74-19,
5  and both Drs. Barnes and Lougheed gave testimony about preprocessing techniques, *see, e.g.*, Ex.
6  EE to Opp. at 213:20-214:1, ECF 83-6, Ex. FF to Opp. at 71:17-72:9, ECF 83-7. With respect to
7  step (e), Dr. Brasch's notebook reports performing partial least squares analysis, *see, e.g.*, Ex. S to
8  Mot. at DOM003380, ECF 74-19 (stating that he "did PLS"), and both Drs. Barnes and Lougheed
9  gave testimony about multivariate analysis, *see, e.g.*, Ex. EE to Opp. at 216:10-16, ECF 83-6, Ex.
10 FF to Opp. at 53:19-56:2, ECF 83-7. In addition, both Drs. Barnes and Lougheed testified that the
11 study actually determined the concentration of glucose in the rabbits, *see, e.g.*, Ex. E to Mot. at
12 37:21-38:13, ECF 74-5, Ex. FF to Opp. at 53:19-56:2, 71:17-72:9, ECF 83-7, and Dr. Brasch's
13 notes observe that performing "PLS" on certain data yielded "good" results, *see, e.g.*, Ex. S to
14 Mot. at DOM003800, ECF 74-19. The '764 patent also describes the results of a rabbit student
15 that fit this timeframe. '764 patent, col. 7 l. 26-col. 8 l. 26. Read favorably, Dr. Brasch's
16 notebook at least raises material questions of fact as to whether the rabbit study included
17 "pretreating" and "multivariate analysis," and Dr. Barnes' testimony, potentially corroborated by
18 Dr. Lougheed, Dr. Brasch's notebook, and the '764 patent, at least raises material questions of fact
19 as to whether the rabbit study obtained a value for the concentration of glucose. Accordingly, this
20 issue cannot be resolved at summary judgment.
21 Whether there is enough admissible evidence for Dominion to meet its burden of proof is
22 another matter. This may be especially difficult in this case, given that Dr. Brasch is unavailable
23 to testify and Dr. Barnes appears to have limited independent recall of critical events. *See, e.g.*,
24 Ex. EE to Opp. at 220:13-17, ECF 83-6. Nevertheless, these issues cannot be resolved at this
25 stage. Because material questions of fact remain as to whether the '764 patent was reduced to
26 practice in 1990, and thus, whether Thomas is prior art, Defendants' motion for summary
27 judgment of invalidity of the '764 patent is DENIED.
28

14

### ii. Non-Infringement

Defendants also move for summary judgment of non-infringement of claim 1 of the '764 patent. Defendants argue they are so entitled because the accused products do not obtain a "second expression for the magnitude of said sensed radiation as a function of wavelength of the sensed radiation." Mot. 10-12, ECF 73. The Court construed "expression for the magnitude of said sensed radiation as a function of wavelength of the sensed radiation" to mean "an array of values (such as is used to represent a curve, function, or graph) representative of the magnitude of the sensed radiation at each measured wavelength." Order Construing Claims 15-18, ECF 55. According to Defendants, this precludes a finding of infringement because the "second expression" allegedly obtained by the accused products is only a series of ratios, which, by definition, cannot represent magnitude. Mot. 11-12, ECF 73. Defendants analogize to a ratio of boys and girls in a classroom, arguing that, for example, a 3:1 ratio of girls to boys indicates nothing about whether the number (magnitude) of girls in the classroom is 3, 75, or 300. *Id*. Defendants also contend that Dominion has not provided evidence that the alleged "second expression" contains data points that are "sufficiently numerous." *Id*. at 11-12.

Dominion does not disagree that the "second expression" in the accused products consists of ratios, but argues that these ratios are simply normalized values of the measured radiation, and that a person of ordinary skill in the art would recognize them as "representative of the magnitude of the sensed radiation." Opp. 13-14, ECF 83. Dominion emphasizes that the "second expression" need only be "representative" of magnitude, not magnitude itself. *Id*. at 14.

The Court agrees with Dominion. During claim construction, Defendants proposed a construction of "expression . . ." that explicitly excluded "determining ratios of discrete light intensity." Order Construing Claims 15, ECF 55. The Court rejected this limitation, finding that "[t]here is no indication in the prosecution history or the specification that an 'expression' cannot be comprised of multiple ratios of discrete values of light intensity . . . . Defendants' construction is overly limiting." *Id*. at 17. Accordingly, the fact that the accused products use ratios does not immediately dispose of Dominion's case. Nevertheless, it does not award Dominion an immediate victory, either: Dominion still must prove that the ratios in the accused products are

"representative of the magnitude." The Court finds that is a factual issue upon which reasonable minds could differ. For example, Dominion's expert, Dr. Causevic, testified that, if you had a specific set of ratios of magnitudes, "you could actually back calculate to what the original ones were." Ex. I to Mot. at 173:19-21, ECF 74-9. He also testified that the ratios in the "second expression" in the accused products contained information on the magnitude of the wavelength. *See, e.g.*, *id.* at 175:22-176:20. Because of this, the Court finds that material questions of fact remain in dispute as to whether the accused products obtain a "second expression."

The Court also finds Defendants' arguments about "sufficiently numerous" unpersuasive. This phrase is not part of the Court's final construction and, in any event, Dr. Causevic opined that "[t]he use of interpolation indicates that the sensor LED array outputs a nearly continuous wavelength spectrum" in his report. *See, e.g.*, Ex. H to Mot. ¶ 104, ECF 74-8. Accordingly, it is not dispositive, and, even if it were, material factual questions remain.

In sum, because there are genuine disputed issues of fact as to whether the accused products obtain a "second expression," Defendants' motion for summary judgment of non-infringement of the '764 patent is DENIED.

## IV.  ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. Defendants' motion for summary judgment that the '177 patent is invalid is GRANTED. Defendants motion for summary judgment of non-infringement of the '177 patent is DENIED AS MOOT.
2. Defendants' motion for summary judgment that the '764 patent is invalid is DENIED. Defendants motion for summary judgment of non-infringement of the '764 patent is DENIED.

**IT IS SO ORDERED.**

Dated: January 20, 2017

_____
BETH LABSON FREEMAN
United States District Judge